## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

**United States of America,**

Plaintiff,

v.

**Wesley McGill,**

Defendant.

**AMENDED DECISION
and ORDER**

24-mj-609-MJP

## APPEARANCES

**For the government:**     **Sean C. Eldridge**
Assistant United States Att'y
100 State St
Rochester, NY 14614

**For Defendant:**     **Anne M. Burger**
Supervisory Assistant Federal
Public Defender
28 E Main St, Ste 400
Rochester, NY 14614

## INTRODUCTION

**Pedersen, M.J.** The government moves to detain Defendant Wesley McGill detained pending trial. I have evaluated the government's motion under the factors found at 18 U.S.C. § 3142(g). Based on those factors, I find that there are conditions I can set that will reasonably assure me of McGill's appearance and the safety of the community. Similarly, I find that the government has failed to meet its burden of showing by clear and convincing evidence that McGill poses a danger to

a person or to the community. Although I find the government has met its lower burden of showing a risk of flight, I determine there are conditions I can set to reasonably assure me he will make appearances in the future.

I therefore **ORDER** Defendant Wesley McGill released pending trial. But I will set stringent conditions of release.

Before turning to the criminal complaint in this case, I pause to commend counsel for their zealous, but respectful, proffers and submissions. Even with the highest of stakes—a defendant's liberty—both counsel performed admirably.

## BACKGROUND

This case began with an investigation into a Telegram Channel allegedly used by McGill. According to United States Postal Inspector Pierce's affidavit in support of the criminal complaint (ECF No. 1 ("Aff.")): "Telegram is an encrypted messaging and social media platform, allowing users to chat confidentially, without risking the content of those messages being retained and/or exposed." (Aff. ¶ 7.) Despite the encryption and confidentiality of Telegram, law enforcement tracked down McGill and bolstered its case by definitively linking him to the Telegram account through "multiple controlled evidence purchases." (*Id.* ¶ 8.) But that was not all: Law enforcement likewise confirmed that the Telegram Channel belonged to McGill through "[p]hysical surveillance,

subscriber data,"[1] along with "confidential source reporting," "and an interview of McGill and his girlfriend[.]" (*Id.*)

***Law enforcement links the Telegram channel selling drugs to McGill.***

Starting with the controlled purchases, law enforcement used a confidential source "to conduct controlled [ ] narcotics purchase[s] of methamphetamine" from McGill. (*Id.* ¶ 12 (alterations added).) The confidential source had provided background information supporting law enforcement's conclusion that the Telegram Channel belongs to McGill. (*Id.* ¶¶ 9–11.) So, law enforcement proceeded with a controlled purchase. (*Id.* ¶ 12.) The confidential source used Telegram to purchase roughly 35 grams of methamphetamine from McGill which McGill shipped to the confidential source. (*Id.* ¶ 12.) Law enforcement traced the package that the confidential informant received to Exotic Kicks and Clothing LLC at 110 Walnut St, Elmira, NY. (*Id.* ¶ 13.) Law enforcement likewise traced the financial transactions involved with these controlled purchases to an account that appears to be operated by McGill. (*Id.* ¶ 15.)

---

[1] The government proffered that McGill's Telegram Channel had about 800 subscribers (as opposed to viewers), suggesting that many, if not most, of these subscribers purchased drugs from McGill at one time or another. However, the government also proffered that only 10–15 of these subscribers were "regulars."

***Telegram enables McGill to distribute drugs across the country.***

From my review of the complaint, it appears that Telegram enabled McGill's drug dealing across the nation through the United States Postal Service. Indeed, on the same day that McGill allegedly sent the package containing methamphetamine to the confidential informant, he sent five other packages to other locations including: "Brownsville, TX; Carbondale, IL; Minneapolis, MN; Columbus, OH; and Woodside, NY." (*Id.* ¶ 14.) McGill's Telegram page even advertised "shipping [sic] all 50 states." (*Id.* at 4.) And he made a "PSA" to pitch Telegram users on his drug operation:



(*Id.*) McGill's advertising is deeply troubling, in part because it signals a new kind of drug dealing. As the government pointed out during its

proffer, Telegram enabled McGill to enter the big leagues of dealing enormous quantities of drugs with ease. Unfortunately, this suggests that others may take McGill's place on Telegram.

### McGill obtains a firearm for his drug-dealing operation.

Worse, according to the government's proffer, McGill admitted that he purchased a gun over Telegram.[2] Unafraid of showing off his new firearm, as the government also related during its proffer, McGill set his profile picture on Telegram to a picture showing his arms and his purchase:



(*Id.* ¶ 25 (McGill set his "profile image on Telegram to a photograph of two arms holding a firearm with an extended magazine."); *see also id.*

---

[2] The affidavit in support of the complaint does not state that he purchased a gun over Telegram, but is not necessarily inconsistent:

> A stolen Smith and Wesson handgun, with an extended magazine (believed to be 30 round capacity) loaded with 24 rounds of ammunition, was recovered from McGill[']s waistband. This appears to be the same pistol described and shown in paragraph 25 of this affidavit.

(Aff. ¶ 36.)

¶ 36 (noting that the same weapon was recovered when law enforcement stopped the vehicle in which McGill was riding).)

***Law enforcement identifies McGill through controlled purchases.***

Later, law enforcement had the confidential informant purchase drugs from McGill in person. Through this controlled purchase, the confidential informant purchased roughly 50 grams of fentanyl from McGill. (*Id.* ¶ 19.) After the controlled purchase, law enforcement watched McGill "walk to meet a woman … and an infant child, inside a local business." (*Id.* ¶ 21.) Law enforcement then confirmed that that woman's address was the same as McGill's. (*Id.* ¶ 23.) To put a belt and suspenders on McGill's identification, law enforcement also confirmed McGill's identity through GPS (*id.* ¶ 24), and photo confirmation that McGill was the person dealing fentanyl to the confidential informant. (*Id.* ¶ 20.)

With enough evidence in hand, law enforcement moved the case toward prosecution. First, law enforcement linked McGill to packages shipped around the country. (*Id.* ¶¶ 28–33.) Just a couple of weeks later, McGill approached the confidential informant about purchasing fentanyl. (*Id.* ¶ 34.)

***Officers arrest McGill, locating 3,000 fentanyl pills.***

To catch McGill in the act of dealing, law enforcement obtained a search warrant. (*Id.* ¶ 35.) On pulling over McGill's car, law enforcement

recovered $2,200 in cash, a cell phone, the handgun with an extended

magazine pictured above, and 3,000 fentanyl pills. (*Id.* ¶¶ 36–37.) When

law enforcement executed the warrant on McGill's residence the same

day, officers found:

- Approximately 115 grams of marijuana;

- Suspected Xanax pills[3] weighing 92 grams;

- Suspected Blue (M-30) fentanyl pills weighing approximately 230 grams;

- A bag containing suspected methamphetamine weighing approximately 75 grams;

- A plastic bag with suspected blue (M-30) fentanyl pills weighing approximately 50 grams;

- Package shipping labels, large quantities of white packing peanuts and clear bubble wrap, and USPS receipts;

- A label maker;

- And finally, two purple bottles containing a liquid and eight plastic bottles of different colors containing a red liquid weighing approximately 2,895 grams.

***McGill admits to his drug-dealing scheme, consenting to searches of packages he had just sent.***

During his time with law enforcement on the day he was arrested,

McGill allegedly waived his *Miranda* rights and admitted to the drug-

dealing operation detailed in this decision. (*Id.* ¶¶ 39–45.) This included

McGill consenting to a search of four parcels that he had shipped two

---

[3] Based on the government's proffer, it appears that the government has since learned that although McGill was selling these as Xanax pills, they were not in fact Xanax.

days before. (*Id.* ¶¶ 44–45.) While many of the allegations in the complaint are undoubtedly damning and show that McGill endangered the community and his family by dealing drugs, I am left with the firm conviction that McGill is beginning to take responsibility for his actions.

Still, McGill dealt astonishing amounts of drugs. The government proffered that McGill admitted that he mailed roughly two to eight packages of drugs a day for three years. That would amount to hundreds of thousands of fentanyl pills since McGill confessed that fentanyl pills were mostly what he sold. Yet McGill apparently knew the dangers of fentanyl, wearing gloves to prepare the fentanyl for shipping.

## LEGAL STANDARD

Congress enacted the Bail Reform Act in 1984 to provide the procedure for release or detention of defendants pending trial. 18 U.S.C. §§ 3141, *et seq.* (codifying the Bail Reform Act). 18 U.S.C. § 3142 provides "the statutory standards for determining whether a criminal defendant should be detained or released pending trial." *United States v. Wang*, 670 F. Supp. 3d 57, 64 (S.D.N.Y. 2023).

***Unless the government moves for detention, the defendant must be released pending trial.***

A defendant awaiting trial must be released unless the Government successfully moves for detention. [4] *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (explaining that the Bail Reform Act codified the "traditional presumption favoring pretrial release 'for the majority of Federal defendants'" (quoting legislative history)). The government may move for detention in the situations anticipated by 18 U.S.C. §§ 3142(f)(1)(A)–(E). Sections 3142(f)(2)(A) & (B) apply to cases that involve a defendant who: (A) poses a "serious risk" of flight; or (B) poses "a serious risk" to specific persons or to the community. 18 U.S.C. § 3142(f)(2)(A) & (B).

***When the government moves for detention, it bears the burden on risk of flight or dangerousness.***

When the government brings a motion for detention under § 3142, it bears the burden on risk of flight, dangerousness, or both. The government must demonstrate that the defendant poses a risk of flight by a preponderance of the evidence. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (collecting cases). That burden of proof is easy: the

---

[4] I am aware that under Section 3142(f)(2) a court may move *sua sponte* for detention "in a case that involves–(A) a serious risk that such person will flee; or (B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. §§ 3142(f)(2)(A) & (B).

government must show it is more likely than not that the defendant poses a flight risk.

The government must demonstrate dangerousness by clear and convincing evidence. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995). This is a tougher burden to define.

Some courts have defined clear and convincing evidence as "something more than" a "preponderance of the evidence, and something less than beyond a reasonable doubt." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (internal quotation marks omitted) (citing *Addington v. Texas*, 441 U.S. 418, 431 (1979)). That definition is not terribly helpful.

A better definition might be that clear and convincing evidence is "evidence that produces in the mind … a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *United States v. Mercado*, No. 24-MJ-561-MJP, 2024 WL 3082704, at *2 (W.D.N.Y. June 20, 2024) (quoting *Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014).

With these burdens in mind, courts have observed that "only a limited group of offenders [ ] should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (quotation omitted).

This is because "[u]pon finding that the defendant presents a flight risk or a danger to the community, the court must then determine whether there are conditions of release that will assure the appearance of the person and the safety of the community." *United States v. Atomei*, No. 24-CR-78 (MKB), 2024 WL 1934195, at *1 (E.D.N.Y. May 2, 2204) (citing *United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022)).

Even when the government has a rebuttable presumption on its side, release is possible. *Mercedes*, 254 F.3d at 436 ("Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." (citation omitted)); *see also United States v. Paulino*, 335 F. Supp. 3d 600, 616 (S.D.N.Y. 2018) (noting that the "presumption" as "set by Congress" is "in favor of release"). Even so, if a defendant's dangerousness is apparent, I should order detention. *See Chimurenga*, 760 F.2d at 403 (noting that when there is "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate" (quoting legislative history)).

Dangerousness does not only include potential acts of violence. *First,* the potential for obstruction of justice or witness tampering may constitute a "threat to the integrity of the trial process, rather than more generally a danger to the community," and be sufficient to detain a

defendant pending trial. *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (quotation omitted). *Second*, I am not limited to considering only the charges pending against a defendant when "assessing the degree of danger posed by [the] defendant's release." *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (reversing release and ordering detention while rejecting the "requirement that the violent conduct" serving as a basis for detention "be connected to the activity charged in the indictment"). So, in considering the g-factors, I will also address matters in the four corners of the complaint. *See, e.g., Zhang*, 55 F.4th at 150 (discussing favorably the district court's consideration of "social media posts by" the defendant "in another case" in determining that the defendant posed a danger on release).

## ANALYSIS

The government moves for detention under 18 U.S.C. § 3142(f)(1)(A), (B), (C), and (E). The government also moves under § 3142(f)(2)(A) based on risk of flight. McGill does not dispute the government's ability to move under these subdivisions.

### *Rebuttable presumptions apply in this case.*

McGill likewise does not dispute the applicability of the presumption under § 3142(e)(3)(A) & (B). Under these provisions of the Bail Reform Act, a rebuttable presumption of dangerousness and risk of flight arises. McGill does not dispute this. Thus, I must "initially assume 'no

condition or combination of conditions will reasonably assure the appearance as required and the safety of the community.'" *United States v. McCann*, No. 23-CR-08 (WFK), 2023 WL 2857917, at *2 (E.D.N.Y. Apr. 10, 2023) (quoting 18 U.S.C. § 3142(e)(3)).

Where this presumption applies, it "places on the defendant only the burden of coming forward with evidence to rebut it." *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986). "The government retains the burden of persuasion." *Id.* (citing *Chimurenga*, 760 F.2d at 405). "Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436 (citing *Martir*, 782 F.2d at 1144). The Second Circuit has been careful to note that even so "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community," and "by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *Id.* For now, I note that McGill has met his burden of production concerning the rebuttable presumption.

### Next, I consider the g-factors to evaluate if detention is warranted.

To assess whether detention is warranted, I must "take into account" the four factors stated in 18 U.S.C. § 3142(g). These are commonly known as the "g-factors." I have "broad discretion to determine

how much weight to assign the factors listed in § 3142(g) based on the circumstances of a particular case." *Zhang*, 55 F.4th at 144. The Second Circuit has explained that discretion by discussing how courts may weigh the g-factors differently in different cases:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant ... That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*Id*. at 149–50 (internal citation omitted). "Thus, while the Court must consider each g-factor, the Court may weigh them differently in different cases." *Mercado*, 2024 WL 3082704, at *3.

I have considered the parties' proffers and exhibits[5] submitted during the detention hearing. I find that the g-factors favor release but

---

[5] I received without objection the below exhibits:

- Government's exhibit 1 (photo of what is allegedly McGill's pistol and its extended magazine).

- Government's exhibit 2 (photo of blue fentanyl pills). It appears that these photos were taken immediately after the search of the vehicle in which McGill was riding.

- Defendant's exhibit A (text messages between a case agent and Defendant McGill's girlfriend).

I determine that I will impose stringent conditions not recommended by Probation.

### The factors favoring the government: The weight of the evidence and the nature and circumstances of the offense charged.

I consider two of the g-factors together. The first factor is "the nature and circumstances of the offense charged," under 18 U.S.C. § 3142(g)(1), "including whether the offense is a crime of violence[.]" *Id.*; *see also United States v. Choudhry*, 941 F. Supp. 2d 347, 350 (E.D.N.Y. 2013). This factor also asks whether the offense charged "involves a controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). That is certainly true here.

Second, I must consider the weight of the evidence against McGill. 18 U.S.C. § 3142(g)(2). It is "not the Court's role at this stage" to evaluate "guilt or innocence." *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016). My duty for now is to determine if I can set conditions of conditions of release that will "reasonably assure the safety of the

---

- Defendant's exhibit B (negative drug test for McGill collected on September 25, 2024).

- Defendant's exhibit C (negative drug test).

Later citations to these exhibits will be as follows: "Def.'s Ex. __" or "Gov't's Ex. __." I have also reviewed and considered the parties' post-detention hearing briefing. (ECF Nos. 9 & 10, Oct. 31, 2024.)

community and the appearance of the defendant at court proceedings." *Zhang*, 55 F.4th at 152.

Here, as my synopsis of the complaint suggests, the government's evidence against McGill is damning. The government rightly points out that Telegram fast-tracked McGill to the big leagues of drug dealing. It takes just a minuscule amount of fentanyl to kill. By my estimate, the 3,000 fentanyl pills found when law enforcement arrested McGill, depending on the strength of the fentanyl contained in them, are enough to kill hundreds of thousands.[6] I need McGill to understand that by dealing the incredible amounts of drugs that it seems he did, he has—at the very least—contributed to the addiction and suffering of hundreds, if not thousands, of people. Even if McGill did not directly cause any death through his drug dealing, he must surely know that addiction leads to violence. And so, McGill made himself part of the chain reaction that is drug dealing; a chain reaction that ruins and ends lives every day. Worse, based on the evidence in the complaint and the government's proffer, he chose to be a part of that chain reaction for three years.

---

[6] McGill's 3,000 fentanyl pills weighed about 293 grams. (Aff. ¶ 41.) As the DEA's website notes, a kilogram (i.e., 1,000 grams) is enough fentanyl "to kill 500,000 people." *Facts [a]bout Fentanyl*, Drug Enf't Admin, https://www.dea.gov/resources/facts-about-fentanyl. This is because, as the government proffered, about two milligrams of fentanyl can be fatal. *See also id.*

The Second Circuit has commented on drug-dealing behavior like this, stating, "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'" *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985). Thus, I may and will consider "the harm being caused by the distribution" of fentanyl, and that this "can be more dangerous than some crimes that are categorized as crimes of violence." *United States v. Zaso*, 2022 WL 4077675, at *2 (W.D.N.Y. Sept. 6, 2022) (quotation omitted).

Beyond showing that McGill had a propensity for dangerous and unlawful drug dealing, I may find that the weight of the evidence suggests that McGill is a flight risk. After all, it makes sense that "an increased probability of conviction increases" McGill's "risk of flight." *Zhang*, 55 F.4th at 151. The Second Circuit thus concluded: "Where, as here, the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." *Id*. That is surely true here.

And given the enormous amount of drugs McGill dealt, he faces severe mandatory minimums. *See id*. ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid the sentence." (citation omitted)); *see also United States v. English*, 629 F.3d 311, 317, 322 (2d Cir. 2011) (affirming the district court's order of

detention based in part on 20-year mandatory minimum creating an in-
centive for the defendant to flee).

Even so, there is much that mitigates these risks. First, between
his arrest and this case, McGill did not attempt to flee. McGill took the
responsible step of moving in with his parents and helping to assuage
Child Protective Services ("CPS") fears about his child staying in his
girlfriend's care. Second, as the federal public defender proffered, McGill
and his girlfriend have been cooperating with CPS. Both took drug tests,
which McGill proffered came back negative. (Def.'s Exs. B & C.)

Third, McGill's family is ready to support him. Despite learning
of his extensive drug dealing, his parents remain willing to post bond,
showing that McGill has strong family ties to the area. In sum, while I
will discuss McGill's qualities in greater depth when discussing the fac-
tor that focuses on McGill, I think it is worth pointing out now that when
facing charges for which he may spend years in prison, McGill's reaction
has been to take responsibility. As discussed, McGill immediately ad-
mitted to his drug-dealing scheme.

While the government's evidence is ironclad, there is more to the
Bail Reform Act than considering the past dangers of McGill's drug deal-
ing. Under 18 U.S.C. § 3142(c), even if I find that "release on personal
recognizance or unsecured appearance bond will not reasonably assure"
McGill's appearance, "or will endanger the safety of any other person or

the community," *United States v. Thomas*, 540 F. Supp. 3d 363, 368 (W.D.N.Y. 2021), I must set only the "least restrictive further condition, or combination of conditions, that … will reasonably assure" McGill's appearance "and the safety of any other person and the community[.]" 18 U.S.C. §§ 3142(c)(1) & (c)(1)(B). So, if I find that there are conditions I can set that will reasonably assure me that McGill will appear and will not pose a danger to any person or the community, I must release him. *United States v. Zherka*, 592 F. App'x 35, 35–36 (2d Cir. 2007); *see also Thomas*, 540 F. Supp. 3d at 368 (affirming my rejection of condition of release pursuant to 18 U.S.C. § 3142(c)(1)(B) because I "must impose the 'least restrictive' combination of conditions" (quoting 18 U.S.C. § 3142(c)(1)(B)). The Bail Reform Act is thus forward-looking.

Accordingly, I would commit legal error if I looked only to the past. *See United States v. Mercado*, No. 24-MJ-561-MJP, 2024 WL 3082704, at *4 (W.D.N.Y. June 20, 2024) (acknowledging that "the federal bail statute 'by its nature, is always looking forward'" (quoting *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009))). Taken with the mitigating circumstances I have noted, the scales have begun to tip away from detention.

### The history and characteristics factor overwhelmingly favors McGill.

The third g-factor directs me to examine "the history and characteristics of the person[.]" 18 U.S.C. § 3142(f)(3). These include things like

McGill's character, physical condition, connections to the community, employment and financial history, and criminal history, among others. *Id.* There is a laundry list of items favoring McGill:

- Paramount among them: McGill has no known criminal history. This strongly suggests that he will follow the rules of pretrial release.

- As stated, McGill appears to have a strong relationship with his family, to the point where his parents are willing to put up their home to secure his release. And he can stay with his family if released. While his mother is employed in a full-time job, his father, a military veteran, stays at home.[7]

- McGill has other family in the area, including a child and significant other.

- Some employment history, although he has not been working for the past 5 months. However, I understand work may soon be available to McGill again.

- McGill suffers from an abnormal heart rhythm and seizures, as indicated by his doctor prescribing him Keppra, an anti-seizure medication. While jails are used to providing medical care, I have little doubt that his chronic conditions would be better managed out of custody.[8]

---

[7] This is significant moral suasion beyond the normal posting of bond to ensure appearance. *See Mercado*, 2024 WL 3082704, at *5 n.5 (noting that a significant bond would "keep" the defendant "in line" with the requirements of his pretrial supervision). Here, if McGill "violates his conditions of release, he faces the prospect of depriving his" family of their home. *Id.* Thus, I find that McGill has "show[n] that the proposed suretors exercise moral suasion" over him. *Wang*, 670 F. Supp. 3d at 66 (quoting *United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001)).

[8] I also find that this provides McGill additional incentive not to flee. Even if McGill flees, he will likely need more of his prescription medications wherever he goes, presenting the difficulty of trying to refill them without detection. In any event, care for his chronic medical conditions is far easier closer to home.

- McGill has no passport and has never traveled outside of the United States.

But I note that there are serious items that do not favor McGill on this factor:

- The government proffered that McGill admitted that he uses drugs more dangerous than marijuana. The Pretrial Services Report indicates only that McGill engages in heavy marijuana use.

- Despite having mental health diagnoses, McGill has not attended treatment.

Worst of all, McGill "mentioned being in the presence of his infant child" to the confidential informant. (Aff. ¶ 11, ECF No. 1.) Later, the confidential informant also saw a video from McGill in which it became clear that McGill's drug dealing is done near McGill's family:

> "CHS shared a video with law enforcement. The video was sent to CHS by VENDOR. The video showed multiple USPS packages. The video was sent to CHS by VENDOR to show that CHS' narcotics package was ready for shipment. In the video, a small child can be heard crying. The video appears to be taken from inside a residence. From this information, I believe this indicates VENDOR packages the narcotics in a residence, around family members. Through physical surveillance, I know MCGILL lived at 114 Walnut St, Elmira, NY with his girlfriend and infant child." Additionally, VENDOR set his/her profile image on Telegram to a photograph of two arms holding a firearm with an extended magazine."

(*Id.* ¶ 25 (references to "vendor" refer to McGill).) But I note that from these allegations (and they are just allegations), that it is not clear that McGill's drug operation was always near his child. Moreover, McGill has

voluntarily mitigated this potential future harm by moving in with his parents.

### Distinguishing the government's cited cases in support of detention.

The government and defense both submitted briefing on the fourth factor under § 3142(g): "[T]he nature and seriousness of the danger to any person or the community that would be posed by the person's release." The government cited to several cases, some of which have a few facts that parallel the situation here. However, I find all are distinguishable from McGill's situation.

*United States v. Fernandes*, 50 F. Supp. 3d 406 (W.D.N.Y. 2014) involved a defendant who posed a significant danger to witnesses against him. While McGill's drug-dealing posed dangers to the community, there is no evidence that he has continued doing so, and there is likewise no evidence that he poses *future* harm to any in the community:

> Perhaps most troubling is a recorded jail call from January 6, 2014, when Defendant spoke to his sister Mindy Stevens and her significant other Andrej Konopski. During the course of that call, Ms. Stevens revealed to Defendant that she had located the names of confidential sources through publicly available information and ascertained that one of the individuals was an inmate at the Green Correctional Facility. Mr. Konopski then got on the phone and suggested to Defendant that he would mail packages of information to "25 guys up in Green" for the apparent purpose of disclosing to these random inmates that they had a witness who was cooperating with law enforcement in their midst. Defendant replied to this proposed plan: "There you go. Do it. Do it. . . . Fuck yeah. Do it!"

*Id.* at 409. This case is inapposite.

22

*United States v. McCann*, No. 23-CR-08 (WFK), 2023 WL 2857917 (E.D.N.Y. Apr. 10, 2023) involved a defendant who had no criminal history but was the leader of a drug distribution ring. The district court acknowledged that, "[a]ccording to the Government, Defendant McCann served as the leader and facilitator of a firearms trafficking conspiracy alleged to have distributed over 50 guns throughout Brooklyn." *Id*. at \*4 (quotation omitted). Here, McGill possessed one weapon, a weapon that the government has not shown was used for violence. Similarly, McGill has strong reasons for not fleeing, and did not do so even after law enforcement executed warrants in late September.

The defendant in *United States v. Kye*, No. 20-MR-88-A, 2020 WL 1815759 (W.D.N.Y. Apr. 10, 2020), had a significant criminal history:

> [T]he Court notes that most significant is Kye's prior criminal record. He pled guilty in 2018 to attempted criminal possession of a weapon in the second degree, a Class D felony offense under New York law. He was sentenced to 5 years of probation and was on probation when he allegedly threw away the bag of fentanyl when seen by law enforcement. Defendant's alleged conduct just over a year after his weapons conviction and while on probation supervision weighs in favor of detention.

*Id*. at \*4. The district judge reviewing the magistrate judge's release order, particularly the provision setting a $25,000 unsecured bond, found that the conditions set were inadequate. Further, the district judge wrote: "[D]efendant Kye's arrest for alleged criminal conduct just over a year after his 2018 conviction, and while on probation supervision,

suggests that he may not abide by the conditions of release imposed by this Court." *Id*. at *6.

In another Western District Court case the judge rejected release writing that the defendant

> [S]imply argues that because the government has now put him out of the drug trafficking business, he no longer poses a danger to the community. This argument ignores, however, the evidence of defendant's propensity for violent behavior and his apparent willingness to commit crimes even when he is under court-ordered supervision. The argument also assumes, without evidence, that defendant cannot and will not return to drug trafficking if he is released.

*United States v. Boorman*, 130 F. Supp. 2d 394, 400 (W.D.N.Y. 2001). Again, in that case the defendant had a criminal record, and thus, there was reason to believe that the defendant's release posed a risk to the community.

Finally, in *United States v. White*, 21-MJ-501-MJP (W.D.N.Y. Mar. 5, 2021), the government proffered at his 2021 detention hearing that White "has been a high-level drug dealer since at least 2017...." *Slip opn*. at 2. When police stopped White on "Route 490 (an east-west limited access highway in Rochester) ... five or six other police cars joined. Police suspected that Defendant was transporting illegal drugs and intended to search the car, but Defendant accelerated out of the area and was not found." *Id*. The government proffered evidence of White's alleged money laundering at a casino in Maryland. *Id*. at 3. In contrast, McGill did not attempt to flee the traffic stop and cooperated with law

24

enforcement in evaluating his Telegram account and some of the shipments the law enforcement agents were able to stop.

### With adequate conditions, I cannot conclude that McGill would pose a danger to the community or any person within it.

As stated, the Second Circuit has recognized that drug dealing poses a danger to the community. *Leon*, 766 F.2d at 81." And Congress has determined that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'" *Chimurenga*, 760 F.2d at 403 (quoting S. Rep. No. 225 at 7; 1984 U.S. Code Cong. & Ad. News at 3189).

Here, there is not a strong probability that McGill will commit additional crimes. Unlike so many other cases I hear, the government has no data points to show that McGill has ever "returned to criminal behavior once free from parole or probation." *Mercado*, 2024 WL 3082704, at *8. The data I do have suggests that McGill is taking responsibility. That is highly persuasive to me because, again, detention asks about the future—not just the past. Likewise, the government has no data points that it can use to show me that Defendant has returned to crime once free of supervised release. Yet that is the surefire way to show future dangerousness.

In this case, I am at a loss about how I can find "with the required 'high degree of certainty'" that Defendant poses a danger especially

given his spotless criminal record and when I intend to subject him to stringent conditions of release. *United States v. Fox*, 602 F. Supp. 3d 434, 443 (W.D.N.Y. 2022) (quoting *Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985)).

As this District has stated, "detention is a monumental imposition on personal freedom[.]" *Id*. at 444. My task is to determine if there is a set of conditions that will reasonably assure McGill's appearance and the safety of all within the community. If such conditions exist, ordering detention would amount to punishing McGill for a crime for which he has not been convicted.

Here, there are conditions that I can set that will reasonably assure me of McGill's appearance and the safety of the community. First, McGill shall reside with his parents, away from his girlfriend and child for the time being. While I do not relish doing this, I believe that I need to incentivize McGill and his family to come together to make sure that he complies with his conditions of release. Accordingly, I am going to direct McGill's parents' to use their home, and possibly another property, as bail for his release. If McGill flees, or if he disobeys his conditions of release, his parents and his sister will likely lose their home. Additionally, McGill must seek and maintain employment. To maintain employment, McGill will need to stop using illegal drugs. I am ordering

McGill to undergo drug treatment if, after an initial screening, such treatment is Pretrial Services' recommendation.

With these conditions, and based on McGill's lack of any criminal history, I can reasonably assure the safety of the community and McGill's appearance. Detention is not warranted.

## CONCLUSION

In this case, the interests of McGill's liberty and the Bail Reform Act's mandate that I set the least restrictive set of conditions militate against detention. I therefore conclude that there are conditions that can be set to reasonably assure against McGill's flight and future dangerousness. The government's motion to detain is **DENIED.**

**IT IS SO ORDERED.**

Dated:     November 1, 2024
           Rochester, NY              _/s/ Mark W. Pedersen_
                                      MARK W. PEDERSEN
                                      United States Magistrate Judge

27